DECISION
Plaintiff appeals the real market value of commercial property identified as Accounts R955531 and R765452 (subject property) for the 2009-10 tax year. A telephone trial was held on March 9, 2011. W. Scott Phinney (Phinney), attorney at law, appeared on behalf of Plaintiff. David Emami (Emami), member of owner-taxpayer of the subject property, testified on behalf of Plaintiff. Brad Anderson (Anderson), Senior Assistant County Counsel, Washington County, appeared on behalf of Defendant. Svetlana Motsiff (Motsiff), commercial appraiser, testified on behalf of Defendant.
Defendant objected to Plaintiffs Exhibit 1 based on lack of foundation. The court admitted Plaintiffs Exhibit 1, noting that the issues raised by Defendant will be considered in weighing the evidence. Plaintiff objected to Defendant's Exhibit A based on lack of foundation and hearsay, noting that Defendant did not provide any of the confidential surveys that it relied upon in preparing Exhibit A. The court admitted Defendant's Exhibit A over Plaintiffs objection, noting that the issues raised by Plaintiff will be considered in weighing the evidence. Plaintiff objected to Defendant's Exhibits B and C because they were not postmarked 14 days before the trial date. Tax Court Rule-Magistrate Division (TCR-MD) 10 C(1) states: "Unless otherwise set by the court, all exhibits must be either postmarked at least 14 days before the trial *Page 2 
date or physically received at least 10 days before the trialdate." (Emphasis added.) Defendant's Exhibits B and C were received more than ten days before the trial date, as required by TCR-MD 10 C(1), and were admitted over Plaintiff's objections.
Defendant made a verbal motion to dismiss after Plaintiff had presented its case, arguing that Plaintiff had not carried its burden of proof under ORS 305.427. Defendant argued that Plaintiff did not provide competent evidence of the subject property's value as of January 1, 2009, in part because he did not provide an appraisal report considering all three approaches to valuation, as required by OAR 150-308.205-A. Defendant noted that "it is not enough for a taxpayer to criticize a county's position," citingPoddar v. Dept. of Rev., 18 OTR 324 (2005). Plaintiff responded that the applicable statute and rule do not require an appraisal report and that Plaintiff had satisfied the burden of going forward with the evidence. The court declined to rule on the motion to dismiss, noting that it would be addressed in the court's written decision.
 I. STATEMENT OF FACTS
A. Subject Property
Both Emami and Motsiff testified that the subject property is located about one mile west of downtown Hillsboro, Oregon. (See also Def's Ex A at 14.) The subject site is 1.65 acres or 71,874 square feet. (Id.). The improvements consist of "five one and two story wood frame buildings[,]" labeled A through E; buildings C and D are connected. (Id. at 1, 14-15.) The buildings range in size from 3,220 to 7,978 square feet. (Id. at 1.) Motsiff testified that the buildings are used primarily for office space, but one building is currently occupied by a beauty school. Emami testified that the subject property was built in three phases; the oldest building was constructed in the early 1900s and originally used as a residence; it was remodeled in 1979. (See id.) The other buildings were constructed in 1979 and 1985. (Id.) *Page 3 
Emami testified that the area of Hillsboro where the subject property is located was prosperous for a time; he used to enjoy occupancy levels close to 100 percent. He testified that the market declined, especially in that area, and vacancy rates rose to 50 to 60 percent. He testified that, in the past ten years, the subject property has not been occupied at more than 50 percent. Emami testified that other buildings in the area include many used car sales lots, another shopping center that is approximately 80 percent vacant, a car wash, and a community center that provides food, day care, vocational training, and other services to low income communities. He testified that he is not aware of any other office buildings in the area.
B. Technical default
Emami testified that, as late as January 2009, Plaintiff owed approximately $700,000 on a mortgage on the subject property and, at some point in late 2008 or early 2009, the bank holding the mortgage found Plaintiff to be in "technical default" and threatened to foreclose on the subject property. He testified that the bank did not consider the property to be worth even $875,000 which is why it was placed in technical default. Emami testified that he had to personally pay off the remaining mortgage of approximately $700,000. Emami did not recall whether the bank appraised the subject property at the time it threatened to foreclose.
C. Appraisals
Plaintiff did not provide an appraisal report, but Phinney stated at trial that he developed an income analysis based both on actual income and expense information provided by Emami and on market data. Phinney stated that he did not consider the cost approach relevant in this case due to the age of the buildings involved. He stated that he did not consider the sales comparison approach relevant due to the lack of good comparable properties. Motsiff determined the value of the subject property using all three approaches to valuation and provided *Page 4 
testimony concerning all three approaches. (See generally Def's Ex A.) However, in her reconciliation, she relied entirely on the indicated value concluded under the income approach, stating "[i]n conclusion, the indicated market value for the subject property as of January 1, 2009, is estimated at a lowest indicator of the value per Income Approach to Valuation[,]" and concluded a value of $1,966,000. (Id. at 43-45.) Because both parties relied only upon the income approach in determining the value of the subject property, the court will only describe testimony relevant to the income approach in the Statement of Facts.
1. Plaintiff's Income Approach
Plaintiff provided income and expense information for 2007, 2008, and 2009. (Ptf's Ex 1 at 4-6.) Phinney stated at trial that, although he prepared Exhibit 1, the income and expense information for the subject property was provided by Emami's office. Emami testified that, in 2007, income totaled $172,056; in 2008, income totaled $90,660; and in 2009, income totaled $66,000. (Id.) Emami testified that Plaintiff, rather than each tenant, pays insurance, maintenance, utilities, and property taxes. Emami testified that many tenants are behind in their payments and some have not paid at all. He testified that it is better to keep tenants than not, due to the increased risk of vandalism and burglary associated with vacancies.
Emami testified that, in 2008, Plaintiff lost one of its tenants, a church, because it could no longer pay rent and utilities. (See Ptf's Ex 1 at 5, 7.) Anderson questioned Emami regarding his earlier statement that Plaintiff paid utilities. Emami testified, in response, that the church had contributed some money towards utilities. Emami testified that, in 2009, a beauty school moved into Building E and pays rent at a rate of $12 per square foot; he testified that the expenses associated with the beauty school are very high due to its heavy usage of utilities including electricity and water. (See id. at 10, 19.) Emami testified that Building E was vacant as of *Page 5 
January 1, 2009. He testified that, as of January 1, 2009, Buildings C and D were vacant except for two tenants; those buildings were plagued by break-ins.
Emami testified that, in 2007, expenses, including property taxes in the amount of $10,759.34, totaled $112,570.14; in 2008, expenses, including property taxes in the amount of $10,807.10, totaled $78,191.94; and in 2009, expenses, including property taxes in the amount of $16,646.20, totaled $248,511.22. (Ptf's Ex 1 at 4-6.) Plaintiff's 2009 expenses included $178,061.00 for "Repair/Maintenance." (Id. at 6.) Emami testified that, in 2009, Plaintiff had to make repairs to the roof and siding that was letting water into the building. (See id.) Plaintiff included "Janitorial" expenses in the amounts of $10,624.11 in 2007, $9,459.88 in 2008, and $3,450.74 in 2009. (Id. at 4-6.) Emami testified that Plaintiff provides janitorial services in the common areas of the buildings. He testified that average expenses are $8 per square foot.
Emami testified that the subject property was 62 percent occupied as of January 1, 2008; 32 percent occupied as of January 1, 2009; and 52 percent occupied as of January 1, 2010. (See Ptf's Ex 1 at 7-9.) In his pro forma, Phinney used potential gross income of $286,140 to calculate an effective gross income of $228,912 based on vacancy rate of 20 percent; using an expense ratio of 35 percent he calculated a net operating income of $148,793.[1] (Id. at 3.) He utilized a capitalization rate of 8.50 percent plus a tax rate of 1.00 percent for an overall rate of 9.50 percent and an indicated value of $1,487,928 for tax year 2009-10. (Id.)
In his closing statement, Phinney referred to market data supporting his vacancy rate and capitalization rate. (See Ptf's Ex 1 at 21 — 62.) Phinney noted that market reports from the first and second quarter of 2009 are more relevant here because they are based on data from the first quarter of 2009 whereas reports from the fourth quarter of 2008 are based on third quarter 2008 *Page 6 
data. (See, e.g., Ptf's Ex 1 at 31, 45.) Phinney noted that market data from the first quarter of 2009 revealed vacancies in the 20 percent range for Portland suburbs, including a vacancy rate of 22.3 percent for the Sunset corridor. (Ptf's Ex 1 at 31, 38.) Based on several market studies, the median suburban vacancy rate was 16.9 percent in the first quarter of 2009 and 15.7 percent in the previous quarter. (Ptf's Ex 1 at 27.)
Motsiff testified that Plaintiff's income analysis is not a true income approach based on appraisal theory because it does not analyze market data with respect to factors including income, expenses, vacancy rates, and capitalization rates. She testified that market data must be considered in addition to the actual figures.
2. Defendant's Income Approach
Motsiff testified that she visited the subject property during February 2010. (See Def's Ex A 2-7.) She testified that she found it difficult to verify the tenant list and that the vacancy level appeared lower than reported.
Motsiff testified that she used the direct capitalization approach. (Def's Ex A at 37.) She testified that the purpose of the income approach is to determine what an investor would expect to receive as of January 1, 2009. Motsiff determined the lease rate based on market data (the Hillsboro office market) and the actual income from the subject property; she found that most office space in the market area was rented on a gross leases basis for $12 to $15 per square foot. (Def's Ex A at 41.) She selected $12 per square foot because that was the average lease rate for the subject property. Using that figure, she determined potential gross income of $285,024. (Id.)
Motsiff determined a vacancy rate of 15 percent based on a "survey of similar properties as part of reappraisal of the multi-tenant offices in Hillsboro area in the fall of 2010," which revealed that typical annualized vacancies ranged from 8 to 16 percent. (Def's Ex A at 41-42.) *Page 7 
Motsiff testified that that survey was sent to all property owners in Hillsboro and the Forest Grove area; Motsiff provided conclusions from the survey analysis, but no actual data from the survey. Additionally, Motsiff reviewed "multiple professional publications" and found "typical vacancy rates of 10.8% to 17% for Westside area class B office properties." (Id.) Motsiff reported that "Grubb Ellis 2009 stated the vacancy rate for suburban office between 15.4% and 16.5% for the 4th Quarter of 2008, 1st Quarter of 2009; Beaverton Market." (Id. at 42, citing Ex 6 at 6 of Def's Ex A. (Emphasis in original.))
Motsiff submitted an excerpt from MarketBeat Portland OfficeReport, fourth quarter 2008, published by Cushman Wakefield, which states that "[a]t 12.6%, the overall vacancy rate for the region is up from 11.9% over the third quarter and 11.7% a year ago. Most of the increase can be attributed to weakness in the Suburban West market area where vacancy increased almost five percentage points to 19.1% over the past twelve months." (Id. at 5.) The Quarterly Urban Development Journal, PSU Center for Real Estate, 4th Quarter 2009, citing Grubb Ellis Fourth Quarter 2009 statistics, indicated the following vacancy rates for the suburban submarkets: Washington Square/Kruse Way reported 14.7 percent vacancy in the fourth quarter of 2008 and 16.3 percent in the first quarter of 2009; the Sunset Corridor reported 22.3 percent in the fourth quarter of 2008 and 25.3 percent for the first quarter 2009; Beaverton reported 15.4 percent vacancy in the fourth quarter of 2008 and 16.5 percent vacancy in the first quarter of 2009; and Tualatin/Wilsonville reported 27.3 percent in the fourth quarter of 2008 and 26.1 percent in the first quarter of 2009. (Id. at 6.) Phinney and Motsiff disagreed as to whether Hillsboro is considered to be in the Sunset Corridor; Motsiff testified that she does not consider Hillsboro to be in the Sunset Corridor. *Page 8 
In addition to considering market vacancy rates, Motsiff attempted to determine if the subject had higher or lower vacancy than the market. During her site visit, Motsiff observed that Building A was 100 percent occupied; Building B had one vacant space; Buildings C and D had some vacancy, but she could not estimate the percentage; and Building E was 100 percent occupied by the beauty school. Using the vacancy rate of 15 percent, Motsiff calculated effective gross income to be $242,270. (Def's Ex A at 42.)
Motsiff considered expense ratios for comparable properties in the area gathered through a countywide survey conducted by Defendant. (Def's Ex A at 42.) Based on that data, she determined that "an expense ratio range from 35% for class B to 45% for class A office buildings, is considered typical for the subject property type." (Id.) Noting that "the average rate of 10% for property taxes was utilized as part of the operational expenses" for "a number of office in Washington County," Motsiff selected an expense ratio of "29% excluding taxes" for a net operating income of $172,012. (Id.)
Motsiff determined a capitalization rate of 7.75 percent for the subject property. (Def's Ex A at 43.) In determining a rate, she considered various market surveys and selected a rate at the top of the range because the subject property "could be considered as a property with slightly higher risk for the purpose of investment in comparison with the more centrally located offices[.]" (Id.) Motsiff determined an effective tax rate of one percent based on Washington County office properties for an indicated value of $1,966,000 (rounded). (Id. at 44.) Phinney questioned Motsiff's determination of a 7.75 percent capitalization rate, stating that capitalization rates in the Pacific Northwest had risen to approximately 8.5 percent by the first *Page 9 
quarter of 2009. A market study submitted by Motsiff indicated that the average "overall capitalization rate" for "Pacific Northwest Office" for the first quarter 2009 was 8.55 percent. (Ex 6 at 2 of Def's Ex A.)
D. Requested Values
In its Complaint, Plaintiff requested that the real market value be reduced to $750,000 and exception value be reduced to zero. (Ptf's Compl at 1.) The value concluded under Plaintiff's income analysis is $1,450,000. (Ptf's Ex 1 at 2.) Plaintiff did not provide any testimony or evidence in support of its requested reduction in exception real market value. The 2009-10 real market value on the roll is $2,045,370 and the 2009-10 maximum assessed and assessed values are both $951,970.
 II. ANALYSIS
A. Motion to Dismiss
As stated previously, Defendant made a verbal motion to dismiss after Plaintiff presented its case, arguing that Plaintiff had not carried its burden of proof under ORS 305.427 and had not provided competent evidence of the subject property's value as of January 1, 2009. Tax Court Rule (TCR) 60 addresses a motion for dismissal at trial.[2] This court has stated that, in order to prevail under TCR 60, "the moving party must demonstrate that the record contains no evidence to support the nonmoving party's claim or claims. The court will not weigh the evidence; rather, it will consider the entire record and afford the nonmoving party all reasonable inferences drawn therefrom, in the light most favorable to that party." Freitag v. Dept. of Rev.,18 OTR 368, 373-74 (2005) (citations omitted). In a subsequent Order granting attorney fees to *Page 10 
Defendant, this court noted that "it is possible to survive a motion to dismiss brought under TCR 60 with a position that is `entirely devoid of legal or factual support.'" Freitag v. Dept. ofRev., 19 OTR 37, 43 (2006) (citations omitted). The court noted that "taxpayers' position in three of the cases did survive such a motion, not because it was supported by either law or fact, but because of the high bar the county had to overcome to succeed on its motion to dismiss." Id.
Here, Plaintiff provided evidence pertaining to the value of the subject property as of January 1, 2009. At the time that Defendant made the motion to dismiss, "the court had to assume the validity of [Plaintiff's] testimony regarding the valuation of [Plaintiff's] property because there was nothing in the record that was strong enough to supplant it in persuasiveness." Id. Thus, Plaintiff provided sufficient evidence to overcome Defendant's motion to dismiss and the motion to dismiss is hereby denied.
B. Approaches of Valuation — Real Market Value
The issue before the court is the 2009-10 real market value of the subject property. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[3] The assessment date for the 2009-10 tax year was January 1, 2009. ORS 308.007(2); ORS 308.210. "When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. *Page 11 
There are three methods used to determine real market value: the cost approach, the income approach, and the sales comparison or market approach. Allen v. Dept. of Rev. (Allen),17 OTR 248, 252 (2003). All three approaches must be considered, although "it may be that all three approaches cannot be applied" for a particular property. OAR 150-308.205-(A)(2)(a). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of the approaches is a question of fact to be determined by the court upon the record."Pacific Power Light Co. v. Dept. of Revenue (PacificPower), 286 Or 529, 533, 596 P2d 912 (1979). The subject property is an income-producing property and both parties relied on the income approach to support their requested values. The court agrees that the income approach is the most relevant of the three approaches in this case.
Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue,4 OTR 302, 312 (1971). Plaintiff "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." Woods v. Dept. of Rev.,16 OTR 56, 59 (2002). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property."Id. at 59, citing King v. Dept. of Rev.,12 OTR 491 (1993).
C. Income Approach
"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." Allen,17 OTR at 253 (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." PacificPower, 286 Or at 540. The Oregon Supreme Court *Page 12 
"decided that the flow of income to be determined is that which `would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]'"Id. at 541-42, citing Mt. Bachelor v. Dept. of Rev.,273 Or 86, 539 P2d 653 (1975).
Both parties here relied on the direct capitalization method to determine expected future income. "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" Allen, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income."Id. at 254 (citation omitted). "To calculate the [net operating income] appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data."Id. at 254.
The parties determined very similar values for the potential gross income of the subject property; Plaintiff concluded a potential gross income of $286,140 whereas Defendant concluded $285,024. Phinney utilized an expense ratio of 35 percent in his income analysis submitted to the court. Plaintiff's sole witness, Emami, testified concerning both the income and expenses associated with operating the subject property. Emami's testimony, particularly concerning expenses, was not entirely reliable. For instance, Emami initially stated that Plaintiff, rather than each tenant, pays insurance, maintenance, utilities, and property taxes. However, upon subsequent questioning by Anderson, Emami stated that a previous tenant, a church, paid part of their utilities and was forced to vacate the subject property when it could no longer pay rent and utilities. The court finds that Plaintiff failed to meet the burden of proof concerning expenses for the subject property and finds Defendant's expense ratio of 29 percent to be reasonable.
The parties' dispute focuses primarily on the vacancy and capitalization rates. In support of its requested vacancy and capitalization rates, Plaintiff supplied market data in the form of 42 *Page 13 
pages of excerpts from professional reports, journals, and other publications as well as six sales compiled, presumably, by Phinney. (Ptf's Ex 1 at 21-62.) Phinney did not discuss that market data until his closing statement, thereby depriving Defendant of an opportunity to cross-examine or otherwise question the content of those materials. The court admitted Plaintiffs Exhibit 1 over Defendant's objection for lack of foundation, noting that it would consider Defendant's objection in weighing Plaintiffs evidence. Phinney also objected to Defendant's appraisal report, Exhibit A, for lack of foundation and hearsay due to the "confidential" market data relied upon by Motsiff Again, the court admitted the exhibit, noting that it would consider Phinney's objection in weighing the evidence. The market evidence presented by each party suffers from certain shortcomings. Plaintiffs market data was not presented as sworn, expert testimony, and Defendant did not receive a meaningful opportunity to question that data. Motsiff relied, at least in part, on confidential market studies that were not made available to Plaintiff or the court.
Ultimately, the court is charged with determining the real market value of the subject property as of January 1, 2009, based on the evidence presented. The court notes that both parties relied on market studies to determine the applicable vacancy rate and capitalization rate. Indeed, Plaintiff and Defendant relied on some of the same sources (e.g., studies by Cushman Wakefield) in their analyses. As stated above, it is not enough for a taxpayer to criticize a county's position. That being said, Plaintiff raised genuine questions concerning the 2009-10 real market value concluded by Defendant, including the weight of market reports from the fourth quarter of 2008 as compared with the first or second quarter of 2009 and which suburban market areas include properties most comparable the subject property.
The court finds that the evidence presented, including the market studies provided and the testimony, supports a vacancy rate of 17 percent and a capitalization rate of 8.5 percent for an *Page 14 
overall capitalization rate of 9.5 percent. Under the income approach, the court finds that the real market value of the subject property as of January 1, 2009, was $1,768,000. In its Complaint, Plaintiff requested that the court "[r]educe exception value to zero" (Ptf's Compl at 1.) Finding that Plaintiff presented no evidence in support of that request, that request is denied.
 III. CONCLUSION
After careful consideration of the testimony and evidence presented, the court concludes that the 2009-10 real market value of the subject property is $1,768,000. The court further concludes that Plaintiff failed to prove its requested reduction in 2009-10 exception real market value by a preponderance of the evidence. Now, therefore,
IT IS DECIDED that Defendant's motion to dismiss is denied;
IT IS FURTHER DECIDED that Plaintiff's requested reduction in the 2009-10 exception real market value of property identified as Accounts R955531 and R765452 is denied; and
IT IS FURTHER DECIDED that the 2009-10 real market value of property identified as Accounts R955531 and R765452 is $1,768,000.
Dated this ___ day of June 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on June 28, 2011. The Court filed and entered this documenton June 28, 2011.
[1] Phinney added property taxes back into his calculation of net operating income.
[2] TCR 60 is made applicable through the Preface to the Magistrate Division rules, which states in pertinent part that, "[i]f circumstances arise that are not covered by a Magistrate Division rule, rules of the Regular Division of the Tax Court may be used as a guide to the extent relevant."
[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007. *Page 1